<u>Not for Publication</u>

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| CHAIM MOSHE BERGSTEIN, *et al.*,<br><br>    *Plaintiffs*,<br><br>  v.<br><br>EMERSON CONVALESCENT CENTER, INC.,<br><br>    *Defendant*. | Civil Action No. 16-8009-JMV-AME<br><br> <br><br><u>OPINION</u> |

**John Michael Vazquez, U.S.D.J.**

  The present matter comes before the Court on Defendant Emerson Convalescent Center, Inc.'s ("Defendant" or "Emerson") motion for summary judgment. D.E. 83. Plaintiffs oppose the motion. D.E. 87. The motion was decided without oral argument pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1. The Court has considered the parties' submissions[1] and denies Defendant's motion. However, as discussed below, certain aspects of Plaintiffs' case are limited going forward.

---

[1] Defendant's brief in support of its motion for summary judgment will be referred to as "Def. Br." (D.E. 83-1); Plaintiffs' opposition to Defendant's motion for summary judgment will be referred to as "Opp'n" (D.E. 87); and Defendant's reply brief in further support of its motion for summary judgment will be referred to as "Def. R. Br." (D.E. 88).

## I.  BACKGROUND[2]

Plaintiffs, minority shareholders in Emerson, contend that Defendant has breached its fiduciary duties to them and caused them harm in several ways.  Plaintiffs first claim that Defendant diluted their ownership interest in the corporation.  *See* Am. Compl. ¶¶ 14-26.  Plaintiffs next say that Defendant has caused the corporation's shareholder distributions to "not reflect" Plaintiffs' "actual share of Emerson's income and/or profits."  *Id.* ¶¶ 27-32.  According to Plaintiffs, Defendant has also "failed to observe corporate formalities[,]" and failed to abide by the corporation's bylaws. *Id.* ¶¶ 33-50.  Plaintiffs add that they have not been able to participate in certain ancillary services offered by Emerson.  *Id.* ¶¶ 51-57.  They further argue that Defendant has denied them information to which they are entitled as shareholders, *id.* ¶¶ 58-69, and that Defendant has engaged in nepotism. *Id.* ¶¶ 70-82.  Finally, Plaintiffs claim that "the company had allowed the transfer of shares of stock to persons or entities unqualified to maintain its status as a sub-chapter S corporation[,]" which will harm Emerson and Plaintiffs "in that they will owe substantial sums in taxes which would affect the profitability and cash flow of the company." *Id.* ¶¶ 83-87.

Defendant denies the bulk of the allegations, but admits "that Emerson has not observed certain corporate formalities set forth in the By-Laws[.]"  Answ. ¶ 42.  Yet, Defendant notes that no shareholder has raised any objection for over twenty years. *Id.*  Defendant further admits each of the four board members received regular compensation. *Id.* ¶ 44.  Defendant also agrees that

---

[2] The facts are drawn from the Defendant's Statement of Material Facts ("SOMF"), D.E. 83-2; Plaintiffs' Counter-Statement of Material Facts ("CSOMF"), D.E. 80; the affidavit of Barry Hollander ("Hollander Aff."), D.E. 83-3; the deposition of Barry Hollander ("Hollander Dep."), D.E. 83-5; the deposition of Chaim Moshe Bergstein ("Chaim Dep."), D.E. 83-8; the deposition of Estie Hollander ("Trauring Dep."), D.E. 83-6; the deposition of Dorothy Prager ("Prager Dep."), D.E. 83-9; and the allegations of the Amended Complaint ("Am. Compl."), D.E. 28, that Defendant admitted to in its Answer ("Answ."), D.E. 31.

minutes of meetings are not kept, *id.* ¶ 48, and that it employs certain family members of the majority holders, *id.* ¶¶ 71, 73, 75, 78.

Defendant is a New Jersey corporation "that operates a nursing home in Emerson, New Jersey[.]" SOMF ¶ 1. "Emerson was started in 1975 by Holocaust survivors, many of whom had extended familial relationships across each of Emerson's founding shareholders' immediate families." *Id.* ¶ 2. Among the "founding shareholders were husband and wife Jacob and Dwoira Bergstein[;]" Jacob's brother Leo Rosenson; Rosenson's brother-in-law, Ernest Hollander; Nat Friedman; and Morris Schnitzer. *Id.* ¶¶ 4-5, 9, 12, 14-15, 31; Hollander Dep. at 12, 15. Named Plaintiffs and the majority holders—who include Barry Hollander, Estie Hollander[3] and Dorothy Prager—are all related by blood or marriage to those founding shareholders. Brothers Jacob Bergsten and Leo Rosenson did not always enjoy good relations, and their respective families have previously litigated over real estate and their common ownership of another senior facility in Brooklyn. SOMF ¶¶ 6-7; Chaim Dep. at 16.

Jacob and Dwoira Bergstein had four children: Chaim Moshe Bergstein, Toby Woolf, Sara Lefkowitz, and Judy Bergstein Handler. *Id.* at 37-38. Judy predeceased her mother Dwoira and was survived by four children of her own: Matanya Handler, Chovav Handler, Hila Greenbaum, and Amiitai Handler. *Id.* at 37. Ernest Hollander had a son, Barry, who is married to Estie Hollander. Hollander Dep. at 8, 49. Leo Rosenson had a daughter, Dorothy Prager, who is Barry's first cousin and who is related to the Bergsteins. Prager Dep. at 8; Chaim Dep. at 14. Jonathan Mechaly is Dorothy Prager's son-in-law. Prager Dep. at 27.

---

[3] "Estie" is short for "Esther." Prager Dep. at 18. Because the parties refer to her as "Estie," the Court does as well.

At the time of Emerson's formation, Jacob Bergstein owned 15 shares, or 10.135% of the corporation.  D.E. 83-7 at 1; CSOMF ¶ 1.  The Amended Complaint reflects that Jacob Bergstein owned "16 or 17 of the then total outstanding beds of 148."  Am. Compl. ¶ 14.  As of the early 2010s, Emerson increased its capacity "from 148 to 155[]" beds.  Hollander Dep. at 104.  Barry Hollander testified, however, the "[t]he share ownership" of the respective owners does "not vary based upon there being additional or less beds[.]"  *Id.* at 63.[4]  At some point, "one [of Emerson's] shareholder[s] was bought out," Hollander Dep. at 64, which apparently was Friedman, SOMF ¶ 31.  According to Barry Hollander, "everybody [*i.e.*, the other shareholders] purchased his interest *pro rata* based on the remaining shareholders in the group[,]" meaning that the percentage of the company owned by each of the remaining shareholders remained the same.  Hollander Dep. at 64.  In other words, no owner's shares were diluted, and no additional shares were ever issued by Emerson.  *Id.* at 65.  Chaim states that he was never provided any information on the issue.  Chaim Dep. at 47.

Emerson provides physical therapy, occupational therapy, speech therapy, pain management therapy, hospice, and Alzheimer's support.  Hollander Dep. at 190-92.  The services are provided by "medical directors that are independent contractors[.]"  *Id.* at 192.  Barry further testified that those services are offered by Emerson itself, and not through ancillary or additional

---

[4] Barry Hollander explained at his deposition:

> I believe that when the nursing home was formed, rather than using 100 percent as ownership, they distributed beds, so to speak.  Not that they represented specific beds at the facility, but instead of shares, this might have been an old European way of doing business, that the beds were given out, so to speak, as shares.

Hollander Dep. at 61.  Certain witnesses also refer to Emerson's informal operating practices.  *E.g.*, *id*. at 79-80; Prager Dep. at 22.

businesses.  *Id.* at 191.  He stated that names such as "Reflections" and "Emerson Cares," are "marketing name[s] that I think show[] up on the website."  *Id.*

At the time of its formation, Emerson adopted bylaws by which it was to be governed and operated.  *See id.* at 35-39.  The parties do not appear to have made the bylaws part of the summary judgment record, but frequently refer to the bylaws and contest their meaning and requirements. *See, e.g.*, Am. Compl. ¶¶ 34-35; Hollander Dep. at 35-39.  Since June or July 2017 through, at the earliest, May 31, 2018, Emerson had three members on the board of directors: Barry Hollander, Dorothy Prager, and Morris Schnitzer.  Hollander Dep. at 43.  Emerson's bylaws, however, require four directors and, until recently, Emerson had five directors.  *See id.* at 43-45.

According to the parties, paragraph eleven of the bylaws provides in relevant part that "[n]o compensation shall be paid to directors as such for their services, but by resolution of the board a fixed sum and expenses for actual attendance at each regular or special meeting of the board may be authorized[.]"  *Id.* at 51.  As of May of 2018, directors were each being paid $500 per month, and no board resolution authorized the payments.  *Id.* at 52.  *See also* Am. Compl. ¶¶ 43-45; Answ. ¶¶ 43-45.  Defendant further admits that when Rosenson was serving on the board, Emerson paid the directors $24,000 per year.  Answ. ¶¶ 43-45.

The bylaws further require that Emerson hold annual shareholder and board of director meetings, and that minutes be kept of those meetings, but Emerson rarely, if ever, had shareholder or board meetings.  *E.g.*, Trauring Dep. at 15-16.  *But see* Hollander Dep. at 46, 51 (testifying that there are "regular board of directors' meetings[.]"  "Usually three or four [per year take place".).  As noted, Emerson admits that it did not keep regular minutes of its board meetings.  Answ. ¶ 48. Barry Hollander and Prager do not recall passing any board resolutions during their tenure.

Hollander Dep. at 52; Prager Dep. at 34-35.  Prager testified that by May of 2018, she was "sure" that the bylaws were not "being complied with."  Prager Dep. at 42.

The bylaws further provide that Emerson is empowered to issue distributions to its shareholders.  Hollander Dep. at 51.  From January 2013 at the latest until June 2017, Emerson paid monthly distributions to its shareholders.  *See* D.E. 87-10; D.E. 83-13; *see also* Am. Compl. ¶ 31.  These monthly distributions remained essentially constant in amount and frequency for several years, with occasional additional, secondary distributions.  *See, e.g.*, D.E. 87-10; D.E. 87-13.  When the corporation was issuing distributions, they were "based on a combination of profit" and cash flow.  Hollander Dep. at 53.  The decision as to whether to issue a distribution was "made on a monthly basis[]" by three Emerson employees: Dorothy Prager, Estie Hollander, and Marianne Oddo.  *See id.* at 53-54.  Barry Hollander explained that each month, an informal "cash flow report [was] prepared."  *Id.* at 53.  The bookkeeper, Oddo, with an eye to the following month's "anticipated expenses[,]" then "[made] a determination as to the distribution."  *Id.* at 53, 55.  Once Oddo "determine[d] whether there's cash available[,]" she "communicate[d ] to Dorothy or Estie, and the decision [was] then made to distribute how much and where."  *Id.* at 54.  The board of directors was not involved in the distribution decisions.  *Id.* at 55.  On June 7, 2017, Barry Hollander sent a letter to all of Emerson's shareholders, explaining that "[a]fter much reflection and a review of the current cash flow situation, we have decided that it is in the best interest of Emerson to skip this month's distribution."  D.E. 83-13 at 1.  Barry blamed the instant litigation for causing that "cash flow situation."  *Id.*  It does not appear that Emerson has made any distributions since then.

Ernest Hollander passed away in 1987, and his son, Barry took his board seat.  Hollander Dep. at 8.  Barry indicated that he was given the position at "a shareholders meeting[]" in a New

York City restaurant.  Hollander Dep. at 9.  Barry also serves as Emerson's president, although he does not remember when he took on the role.  *Id.* at 7, 38.  Barry testified that he is at Emerson "at least once a month."  *Id.* at 18.  It appears that since about 2013, Barry has received an annual bonus of $10,000 from Emerson.  *See id.* at 78-79, 123.

Estie Hollander works at Emerson three days per week.  *Id.* at 82.  Her "wages are $79,425."  *Id.* at 81.  Emerson also provides Estie with health insurance, leases a BMW X4 automobile for her, and pays the car's expenses.  *Id.* at 82.  Estie uses the car to drive from New York City to Emerson and for her personal use.  Trauring Dep. at 43.  Estie reports to Marta Santiago, the "administrator," who oversees almost all of Emerson's operations on a daily basis.  *See id.* at 34; Prager Dep. at 19.  Estie also appears to receive bonuses from Emerson.  *E.g.*, Trauring Dep. at 42-43.

Dorothy Prager took her father's seat on the board of directors when he passed away in January 2017.  Prager Dep. at 20; Hollander Dep. at 13.  Prager was appointed by two other board members, Morris Schnitzer and Barry Hollander, but was not appointed pursuant to a shareholders' meeting or a formal board meeting.  Prager Dep. at 21-22.  Prager serves as the Secretary to the board but does not record formal minutes.  *See id.* at 25, 32-33.  In addition, she is employed part-time at Emerson as its assistant administrator, working about two days per week.  *Id.* at 4; Hollander Dep. at 82.  Her base salary is $52,105.  Hollander Dep. at 81.  She too reports to Santiago.  Prager Dep. at 18.  In addition to her salary, Prager receives "equalization."  As explained by Barry, "[be]cause Ms. Prager does not have, for example, the leased vehicle.  And I don't think she has the insurance, so at the end of the month, there's a calculation that's done to determine what my wife received in benefits, and Ms. Prager gets 2/3 of that."  Hollander Dep. at 124; *see also* Prager Dep. at 50-52.  Prager receives two-thirds of the amount that Estie receives

because Prager works two days per week while Estie works three.  Prager Dep. at 51-52.  She has also received bonuses from Emerson.  *Id.* at 70.

Barry and Estie Hollander have American Express cards that they use to make purchases on Emerson's behalf.  Hollander Dep. at 115.  Prager also has a credit card that she uses for the same purpose.  *Id.* at 117.  All three use the "points" those cards generate for their personal purposes.  *Id.* at 117-18.

Jonathan Mechaly is married to Dorothy Prager's daughter and is employed as Emerson's director of business development.  Prager Dep. at 27-28.  He started in approximately 2013, and was brought on by Barry Hollander, Morris Schnitzer, and Mark Kamin.  *Id.* at 28-29.  Before working at Emerson, "he worked in similar positions with a large corporate nursing home company named Rivera[, and] was being recruited by some of [Emerson's] competitors[.]"  *Id.* at 29.  Prager describes Mechaly's job as follows:

> He oversees the entire marketing department and the entire admissions department.  So he meets with doctors.  He meets with hospital administrators.  He meets with social workers.  He plans events.  He entertains all the people that I just mentioned.  He purchases marketing materials.  He oversees our website.  He goes to the hospitals.  Screens referrals as needed.  He develops our business.

*Id.* at 30.  He also reports to Marta Santiago.  *Id.*

Jacob Bergstein passed away in 1991, and Dwoira inherited his shares.  Chaim Dep. at 12; Hollander aff. ¶ 2.  On June 1, 2003, Dwoira created the Dwoira Bergstein Revocable Living Trust, which was amended and restated on March 18, 2012.  D.E. 83-11 ("Trust").  Chaim Moshe Bergstein and Sara Lefkowitz were selected to serve with Dwoira as co-trustees.  *Id.* at 1.  Dwoira transferred her interest in Emerson to the Trust.  Hollander aff. ¶ 3.  Article 5 of the Trust directs how the Trust's assets are to be distributed upon Dwoira's passing, providing in part as follows:

> Upon my death and after making provision for the payments under Article 12, the Trustee shall distribute the remaining Trust Estate as follows:
>
> …
>
> 5.2 Residuary Trust Estate.  The Trustee shall divide the remaining Trust Estate into separate shares for my descendants, per stirpes (thus, the share of my deceased daughter, Judy Handler, is to pass to her descendants, per stirpes).  The Trustee shall hold each beneficiary's share as a separate trust under Article 6.

Trust at 4.  Article 6, in turn, is entitled "TRUSTS FOR DESCENDANTS" and sets forth the duties of a trustee for "any trust created for a descendant" of Dwoira.  *Id.*  Article 12 addresses the "PAYMENTS OF EXPENSES AND TAXES."  *Id.* at 11.

Dwoira Bergstein passed away in 2015.  SOMF ¶ 17.  Around March 1, 2016, Jacob Guz acquired shares in Emerson, bringing the number of shareholders of record of Emerson to twenty. Hollander aff. ¶ 11.

The Trust filed its initial Complaint on September 2, 2016, in the Superior Court of New Jersey. D.E. 1 at 8.  Defendant then removed the action to federal court.  *Id.* at 4.  On November 3, 2016, Defendant moved to dismiss the case for lack of subject-matter jurisdiction, arguing that the Trust could not maintain the action without the authorization of both trustees.  D.E. 2-1 at 1. After the Trust filed opposition, D.E. 7, Defendant withdrew the motion on November 28, 2016. D.E. 9.  Defendant filed an Answer on January 10, 2017, D.E. 11, after the Trust moved for a default the day before, D.E. 10.

On April 5, 2017, the Trust's interest in Emerson was "transferred from the Trust to Plaintiffs as beneficiaries of the Trust."  Am. Compl. ¶ 22; Answ. ¶ 22; *see also* D.E. 87-2. Although not clearly indicated, it appears that the parties agree that Plaintiffs are now shareholders of record in Emerson.

On October 10, 2017, Plaintiffs filed an Amended Complaint, with themselves captioned as Plaintiffs. Am. Compl. Plaintiffs bring three claims against Defendant: (1) "Demand for Books and Record Inspection" pursuant to N.J. Stat. Ann. § 14A:5-28; (2) "Shareholder Oppression" pursuant to N.J. Stat. Ann. § 14A:12-7; and (3) "Accounting" under the common law. *Id.* ¶¶ 88-106. Defendant answered on October 31, 2017. Answ. Discovery closed on September 17, 2020, D.E. 74, and Defendant then filed the instant motion.

## II. STANDARD OF REVIEW

A moving party is entitled to summary judgment where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact in dispute is material when it "might affect the outcome of the suit under the governing law" and is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Disputes over irrelevant or unnecessary facts will not preclude granting a motion for summary judgment. *Id.* "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255)). A court's role in deciding a motion for summary judgment is not to evaluate the evidence and decide the truth of the matter, but rather "to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. Ultimately, there is "no genuine issue as to any material fact" if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex Corp.*, 477 U.S. at 322. "If reasonable minds could differ as to the

import of the evidence," however, summary judgment is not appropriate.  *Anderson*, 477 U.S. at 250-51.

The showing required to establish that there is no genuine issue of material fact depends on whether the moving party bears the burden of proof at trial.  On claims for which the moving party does not bear the burden of proof at trial, the movant must establish "that there is an absence of evidence to support the nonmoving party's case."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  In contrast, "[w]hen the *moving* party has the burden of proof at trial, that party must show *affirmatively* the absence of a genuine issue of material fact[.]"  *In re Bressman*, 327 F.3d 229, 238 (3d Cir. 2003) (quoting *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1438 (11th Cir. 1991)).  This affirmative showing requires the moving party to show that "'on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party.'"  *In re Bressman*, 327 F.3d at 238.

### III.    DISCUSSION

The Court first analyzes Counts One and Three—concerning the turnover of documents and an accounting—followed by Count Two—shareholder oppression.[5]

---

[5] As to the applicable substantive law, "[t]o choose which state law will apply, 'a federal court … must apply the choice-of-law rules of the forum state.'"  *White v. Sunoco, Inc.*, 870 F.3d 257, 263 (3d Cir. 2017) (quoting *LeJeune v. Bliss-Salem, Inc.*, 85 F.3d 1069, 1071 (3d Cir. 1996)); *see also Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941).  The parties do not perform a choice of analysis but appear to assume that New Jersey law governs.  Seeing no clear reason to deviate from the parties' application of New Jersey law, the Court will apply New Jersey law.  *See Manley Toys, Ltd. v. Toys "R" Us, Inc.*, No. 12-3072, 2013 WL 244737, at *2 (D.N.J. Jan. 22, 2013) ("Because the parties have argued the viability of the . . . claims as though New Jersey substantive law applies, the Court will assume that to be the case.") (citing *USA Mach. Corp. v. CSC, Ltd.*, 184 F.3d 257, 263 (3d Cir. 1999)).  Additionally, the Court observes that the New Jersey Business Corporation Act, in N.J. Stat. Ann. § 14A:1-3, mandates that the "act shall apply to … every corporation is organized under this act[.]" N.J. Stat. Ann. § 14A:1-3(1).  Because Emerson is a New Jersey corporation, SOMF ¶ 1, the Court further presumes that the Business Corporation Act applies.

### A. Counts One and Three: Statutory Right to Inspect and Common Law Accounting

In Count One, Plaintiffs allege that they have the right under N.J. Stat. Ann. § 14A:5-28 "to access Emerson's books and records," and that Defendant has denied them access. Am. Compl. ¶¶ 89-91. In Count Three, Plaintiffs seek a common law accounting. *Id.* ¶¶ 103-04. In support of its summary judgment motion, Emerson indicates that both claims are moot because it provided the relevant information in discovery. Def. Br. at 6 n.3; Def. R. Br. at 9 n.5.

Plaintiffs note that Defendant has turned over "general ledgers" and "disbursement journals." Opp'n at 22-23. To the extent Plaintiffs argue that they are owed further documentation, Plaintiffs make those arguments in terms of discovery, not the statutory right to inspect or common law accounting. *E.g.*, *id.* at 23-25; D.E. 87-16; *see also* Opp'n at 6 ("As critical discovery remains outstanding, judgment as a matter of law should be denied."). Alternatively, Plaintiffs assert that the information they seek through Counts One and Three of the Amended Complaint could be awarded as a remedy should they prevail on Count Two. *Id.* at 5.

The Court has previously rejected Plaintiffs' contention that discovery remains outstanding. In the order granting Defendant leave to move for summary judgment, the Court noted that "pursuant to Judge Falk's September 11, 2020 discovery order, D.E. 74, discovery was closed on September 17, 2020." D.E. 82 at 1. Plaintiffs do not make any arguments causing the Court to revisit its previous determination that discovery is closed.

But the Court finds Defendant's arguments on this point to be unavailing. "If the defendant (or any party) claims that some development has mooted the case, it bears '[t]he heavy burden of persua[ding] the court' that there is no longer a live controversy." *Hartnett v. Penn. State Educ. Ass'n*, 963 F.3d 301, 305-06 (3d Cir. 2020) (alterations in original) (quoting *Friends of the Earth v. Laidlow Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000)). Here, Defendant merely asserts

in two footnotes that Plaintiffs' first and third claims have been mooted by the discovery process. Def. Br. at 6 n.3; Def. R. Br. at 9 n.5.  However, Defendant does not indicate what documents Plaintiffs would be allowed to access under Counts One and Three or what it has turned over that would satisfy Plaintiffs' requests.

Accordingly, the Court denies Defendant's motion for summary judgment as to Count One and Count Three.

### B.  Count Two: Shareholder Oppression

In Count Two, Plaintiffs assert that Emerson has oppressed them as minority shareholders. Am. Compl. ¶¶ 94-101.[6]  Defendant argues that it is entitled to summary judgment because the number of Emerson shareholders exceeds the statutory limit.  Defendant also argues that it is entitled to judgment as to Plaintiffs' substantive arguments.

### 1. The Number of Emerson Shareholders

N.J. Stat. Ann. § 14A:12-7 governs the rights of oppressed minority shareholders and is "interpreted broadly to provide remedies for the distinctive problems of close corporations." *Brenner v. Berkowitz*, 634 A.2d 1019, 1029 (N.J. 1993) (internal quotation marks omitted).  The

---

[6] In their Amended Complaint, Plaintiffs name only Emerson as the Defendant, and not any of the majority shareholders.  However, Plaintiffs also allege that "[t]he Defendant has used its majority shareholder status to … destroy Plaintiffs' reasonable expectation [sic] of being a shareholder [sic][.]" Am. Compl. ¶ 97.  Other paragraphs similarly seem to conflate the named Defendant, Emerson, and its majority shareholders.  However, "[p]ursuant to the laws of New Jersey, it is axiomatic that 'a corporation is a separate entity from its shareholders, and that a primary reason for incorporation is the insulation of shareholders from the liabilities of the corporate enterprise.'" *Linus Holding Corp. v. Mark Line Indus., LLC*, 376 F. Supp. 3d 417, 424-25 (D.N.J. 2019) (internal citation omitted) (quoting *State Dep't of Env't Prot. v. Ventron Corp.*, 468 A.2d 150, 164 (N.J. 1983)).  As a result, the Court does not read the Amended Complaint as bringing claims against the majority shareholders themselves.  *See Verni ex rel. Burstein v. Harry M. Stevens, Inc.*, 903 A.2d 475, 498 (N.J. Super. Ct. App. Div. 2006) ("[T]he party seeking an exception to the fundamental principle that a corporation is a separate entity bears the burden of proving that the court should disregard the corporate entity.") (alteration in original) (quoting *Tung v. Briant Park Homes, Inc.*, 670 A.2d 1092, 1096 (N.J. Super. Ct. App. Div. 1996)).

term "minority shareholder" includes "any shareholder, regardless of his percentage of ownership interest ... [who] does not have control of the corporate shares with respect to voting rights." *Berger v. Berger*, 592 A.2d 321, 327-28 (N.J. Super. Ct. Ch. Div. 1991).  The act authorizes a court to consider various equitable remedies should a plaintiff establish that it has been oppressed under the following circumstances:

> In the case of a corporation having 25 or less shareholders, the directors or those in control have acted fraudulently or illegally, mismanaged the corporation, or abused their authority as officers or directors or have acted oppressively or unfairly toward one or more minority shareholder in their capacities as shareholders, directors, officers, or employees.

N.J. Stat. Ann. § 14A:12-7(l)(c).  Thus, the act serves to prevent fraudulent, illegal, or oppressive conduct, which is defined as conduct that "frustrate[es] a shareholder's reasonable expectations." *Brenner*, 634 A.2d at 1028.  However, "[m]ere disagreement or discord between the shareholders is not sufficient for a violation of the close corporation statutory provision." *Id.* at 1027.

In addition to establishing misconduct, a shareholder must show that there is "a nexus between the harm and the minority shareholder's interest in or expectation in the company." *Id*. at 1028.  "In determining whether such a nexus exists the Court must consider those acts that affect a shareholder's stock interest, as well as those that are specifically targeted to the shareholder." *Food King, Inc. v. Norkus Enters., Inc.*, No. 04-1500, 2008 WL 3843719, at *16 (D.N.J. Aug. 15, 2008).  Finally, "[c]ases involving [N.J. Stat. Ann. §] 14A: 12-7(1)(c) are very fact-sensitive, and thus any hard and fast rules are difficult to formulate." *Brenner*, 634 A.2d at 1033.

Defendant asserts that Plaintiffs cannot maintain this action because Emerson had more than twenty-five shareholders when the action began and has more than twenty-five today.  Def. Br. at 7-8 (footnote omitted).  Based on the terms of the Trust, Defendant argues that "at or about the time that Dwoira Bergstein died, there came into being seven new trusts, each one holding

14

Emerson shares for the benefit of one of [her] seven living descendants[.]" *Id.* at 9 (footnote omitted). These new trusts, Defendant claims, should be counted as shareholders, putting the number of shareholders over the twenty-five-shareholder cap. *Id.*

Plaintiffs counter that at the time the action was instituted, "Emerson had no more than 20 shareholders" because the "Trust was the holder of record until April 5, 2017[.]" Opp'n at 9, 10. Defendant responds that "under the particular circumstances of this case, the doctrine of equitable conversion mandates that the seven living descendants of Dwoira Bergstein be counted as Emerson shareholders as of the time of Dwoira Bergstein's death." Def. R. Br. at 5. Defendant alternately "submits that the public policies that underlie [N.J. Stat. Ann.] 14A:12-7(1)(c) warrant a holding that a cause of action for shareholder oppression should be barred when the subject corporation comes to have more than twenty-five shareholders[.]" *Id* at 13. Plaintiffs note that N.J. Stat. Ann. § 14A:12-7(2) speaks in terms of "[a]n action [being] brought[.]" Opp'n at 7 (citing N.J. Stat. Ann. § 14A:12-7(2)). Plaintiffs further assert that Defendant has failed to cite authority indicating that an action "may not be maintained if the number of shareholders increases after litigation is commenced[.]" Opp'n at 8.

The threshold question is whether Emerson had more than twenty-five shareholders when this action commenced. If it did, then their claim pursuant to N.J. Stat. Ann. § 14A:12-7(l)(c) was delinquent from the start. If not, then the Court must consider whether Plaintiffs can nevertheless maintain their claim once the numbers of shareholders exceeded the statutory limit. The Court finds that Plaintiff had fewer than twenty-five shareholders when this matter began. The Court also finds that Plaintiffs may maintain their cause of action after the number of shareholders topped twenty-five, but that their remedies are limited to matters before the statutory maximum was surpassed.

The parties do not dispute that when the original Complaint was filed, the Trust was the shareholder of record for Emerson's shares.  Nor do the parties contest that the Trust provided that upon Dwoira Bergstein's death, the trust estate was ultimately to be divided into additional trusts (thereby increasing the number of Emerson shareholders).  And the parties do not dispute that Dwoira passed away in 2015 while the Complaint was filed in 2016.  However, it appears that the additional trusts stemming from the Trust were not officially created until April 5, 2017.

Defendant argues that beneficiaries of the Trust should be counted toward the number of shareholders.  Def. Br. at 10.  The Court disagrees.  While the New Jersey Supreme Court has not considered this issue, the Third Circuit has—and rejected it.  *Sery v. Fed. Bus. Ctrs., Inc.*, 365 F. App'x 396, 397 (3d Cir. 2010) ("To accept that contention, however, would fly in the face of the plain meaning of the Act, which defines 'shareholder' only as the holder of record without mentioning beneficial ownership, and nothing in the Provision suggests that the Court should consider beneficial ownership when counting the number of shareholders.").  Although non-precedential, the Court finds the Third Circuit's reasoning persuasive and adopts it here.

Defendant also argues that pursuant to the plain terms of the Trust, the additional trusts were created on Dwoira Bergstein's death.  Def. Br. at 8.  Defendant is correct that the Trust expressly indicated that "[u]pon [Dwoira's] death . . .[t]he Trustee shall divide the remaining Trust Estate into separate shares from my descendants[.]"  Trust at 4.  However, Defendant overlooks another condition precedent—that is, the trustee was to act on Dwoira's passing "and after making provision for the payments under Article 12[.]"  *Id.*  Article 12 addressed the payment of expenses and taxes.  *Id.* at 11.  To this end, Plaintiffs contend that when the original Complaint was filed, the trustees had not fulfilled their obligations as to Article 12.  Opp'n. at 12.  As a result, Plaintiffs assert, the conditions necessary for the creation of the new trusts had not yet been fulfilled.  *Id.*

Defendant presents no evidence to the contrary.  As a result, the Court finds that there were less than twenty-five Emerson shareholders when this action was commended and rejects Defendant's equitable conversion argument.

The Court now turns to the issue of whether the suit could no longer be maintained once the Trust distributed Dwoira Bergstein's shares, resulting in Emerson having more than twenty-five shareholders.  The operative date appears to be April 5, 2017.  Neither party cites to any caselaw in support of their positions on this issue.

The Court is not persuaded by Plaintiffs' argument that N.J. Stat. Ann. § 14A:12-7(1)'s introductory paragraph limits the temporal reach of the cap.  A "fundamental canon of statutory construction" is that "the words of a statute must be read in their context[.]"  *United States v. Andrews*, 12 F.4th 255, 261 (3d Cir. 2021) (quoting *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 320 (2014)).  The introductory language provides in part that a court "in an action brought under this section, may appoint a custodian, appoint a provisional director, order a sale of the corporation's stock as provided below, or enter a judgment dissolving the corporation[.]"  N.J. Stat. Ann. § 14A:12-7(1).  The language merely refers to the remedies a court can award if a plaintiff is successful, not whether an action can be maintained if the twenty-five-shareholder cap is exceeded after a suit is filed.

Nor is the Court persuaded by Plaintiffs' argument that N.J. Stat. Ann. § 14A:12-7(2) limits N.J. Stat. Ann. § 14A:12-7(1)(c) to the time in which a matter is instituted.  N.J. Stat. Ann. § 14A:12-7(2) indicates that "[a]n action may be brought under this section by one or more directors or by one or more shareholders.  In such action, in the case of appointment of a custodian or a provisional director, the court may proceed in a summary manner or otherwise."  The language refers to *who* may bring an action, not *when* a person can bring such an action.

As to the remaining arguments, the Court must rely on the traditional tools of statutory construction, which include "the statute's language, structure, subject matter, context, and history[.]" *Coyoy v. United States*, 526 F. Supp. 3d 30, 36 (D.N.J. 2021) (quoting *Almendarez-Torres v. United States*, 523 U.S. 224, 228 (1998)); *see also Sery*, 365 F. App'x at 397.  N.J. Stat. Ann. § 14A:12-7(1)(c) provides that a suit can be brought by "a corporation *having* 25 or less shareholders[.]" (emphasis added).  The verb, "having," is expressed in the present tense.  This is in contrast with the operative verbs that come at the end of the subsection, which are expressed in the past tense.  *See* N.J. Stat. Ann. § 14A:12-7(1)(c) ("[*H*]*ave acted* fraudulently or illegally, *mismanaged* the corporation, or *abused* their authority as officers or directors or *have acted* oppressively or unfairly toward one or more minority shareholders[.]" (emphasis added)).  In *Brenner*, the Supreme Court of New Jersey explained that the use of the past tense made clear that the conduct that gives rise to a shareholder oppression claim need not "be 'on-going' at the time of trial for the statute to apply."  634 A.2d at 1028.  "If the Legislature had intended that the statute apply only to continuing acts," the *Brenner* Court explained, "then the use of present tense, *i.e.*, 'are acting,' would have accomplished that goal.  In this statute, the Legislature used a verb form connoting past conduct."  *Id.*

Here, by contrast, the New Jersey Legislature chose to use the present tense, and limit shareholder oppression actions to instances with "corporation[s] *having* 25 or less shareholders[.]" N.J. Stat. Ann. § 14A:12-7(1)(c) (emphasis added).  In light of the use of past-tense verbs in this subsection, the legislature could have opted to use the past tense here as well, but it did not.  For example, the statute could have been drafted to read a "corporation having 25 or less shareholders, or a corporation that had 25 or less shareholders at the time of the wrongful conduct."  This distinction telling, as "[d]iffering verb tenses within one statute are significant."  *Neto v.*

*Thompson*, 506 F. Supp. 3d 239, 248 (D.N.J. 2020); *see also Singh v. Att'y Gen. of U.S.*, 12 F.4th 262, 278 (3d Cir. 2021) (placing weight on tenses of verbs in statute).  Moreover, the New Jersey Legislature has passed other similar statutes that remove all doubt.  For example, N.J. Stat. Ann. § 14A:3-6.2(1) provides as follows

> A shareholder *may not commence or maintain* a derivative proceeding unless the shareholder: (1) was a shareholder of the corporation *at the time of* the act or omission complained of *or became a* shareholder through transfer by operation of law from one who was a shareholder at that time and remains a shareholder throughout the derivative proceeding[.]

N.J. Stat. Ann. § 14A:3-6.2(1) (emphases added).  In other words, when the New Jersey Legislature has wanted to make unmistakably clear that a certain condition must exist at the time of filing and continue throughout the pendency of the action, it has done so.  As a result, the Court finds that the key statutory language is ambiguous and looks to other sources to inform it analysis.  *Andrews*, 12 F.4th at 260.

New Jersey courts have observed that the New Jersey Legislature "relied upon" the Model Business Corporation Act ("Model Act") "in enacting the Business Corporation Act."  *Com. Bancorp, Inc. v. InterArch, Inc.*, 9 A.3d 1056, 1062 (N.J. Super. Ct. App. Div. 2010).  The Model Act contains more generous protections than New Jersey's statute.  Section 14.30(b)(ii) of the Model Act provides for a three-hundred-shareholder cap, and makes clear that the cap applies "on the date of the filing of the proceeding[.]"  Model Bus. Corp. Act §§ 14.30(b)-(ii) (1969) (Am. Bar Ass'n, amended 2014).  "Deviation from the language of a uniform or model act is presumed to be deliberate."  Norman J. Singer, 2B Sutherland Statutory Construction § 52:5 (6th ed. 2005).[7]

_____

[7] The Court further notes that another provision of the Business Corporation Act, N.J. Stat. Ann. § 14A:7-6, when originally enacted, limited the corporations that could issue redeemable shares of stock to those corporations that had twenty-five or fewer shareholders.  *See* N.J. Stat. Ann. § 14A:7-6(3)-(4), L. 1969, c. 102, § 1968.  However, in 1988, the Legislature revised subsection

Similarly, the New Jersey Supreme Court has observed that the New Jersey Legislature has taken a "cautious approach to expanding the rights and remedies of minority shareholders[,]" *Brenner*, 634 A.2d at 1025. The New Jersey Supreme Court has noted that those charged with crafting the modern version of 14A:12-7(1)(c) were concerned that the protections given by the Business Corporation Act could be abused, *id.* at 1026, and warned that "courts must ensure that minority shareholders are not permitted to use the statute to tyrannize the majority." *Id.* at 1033.

Faced with this ambiguity, along with legislature's concern that oppression actions could be subject to abuse and the competing admonition that New Jersey's oppression statute is to be construed liberally to protect minority shareholders, the Court concludes that this case may proceed even though Emerson had more than twenty-five shareholders as of April 5, 2017. However, Plaintiffs can only seek redress for any harm that occurred before that date.[8] Moreover, certain remedies may no longer be available to Plaintiffs, such as the dissolution of Emerson.

The Court, therefore, denies Defendant's motion for summary judgment as to the twenty-five-shareholder limitation. However, Plaintiffs can no longer rely on N.J. Stat. Ann. § 14A:12-

---

three and repealed subsection four to eliminate that limitation. S. Judiciary Comm., S. Doc. No. No. 2115—L.1988, c. 94, ¶ 25 (N.J. 1988). The legislative history explains that in the view of the Corporation Law Revision Commissioners, "[t]he 25 shareholder limitation was subject to manipulation to eliminate redeemable shares. The Commission determined that there is no need to restrict the availability of shares redeemable at the option of the holder to closely held corporations." Commr's' Comm. to 1988 Ams. In contrast, the Legislature enacted N.J. Stat. Ann. § 14A:12-7(1)(c)'s cap over forty years ago and has not revised or repealed it, potentially indicating that the legislature has not determined that this limitation has been subject to manipulation or led to inequitable results.

[8] The Court's ruling is limited to the facts of this case. The Court can envision a scenario in which such a limitation may not be appropriate, for example, if majority shareholders take improper action during the litigation to increase the number of shareholders. However, those circumstances are not present here. Emerson exceeded the statutory cap because, unfortunately, Dwoira Bergstein passed away and her Trust required the new trusts.

7(1)(c) to vindicate alleged injuries suffered after Emerson had more than twenty-five shareholders.

### 2. Plaintiffs' Substantive Assertions

Turning to the remainder of Defendant's arguments, Defendant first asserts that all of Plaintiffs' claims, with the exception of their stock-dilution claim, are derivative claims masquerading as direct claims. Def. Br. at 12-13. Defendant continues that because Plaintiffs did not comply with the procedural requirements for bringing a shareholder's derivative suit, their claims of oppression should be barred. *Id.*

Under New Jersey law, "[t]o determine whether a complaint states a derivative or an individual cause of action, courts examine the nature of the wrongs alleged in the body of the complaint, not the plaintiff's designation or stated intention." *Strasenburgh v. Straubmuller*, 683 A.2d 818, 830 (N.J. 1996). "A shareholder may maintain a direct action against a corporation or its directors if the shareholder suffers a 'special injury.'" *Tully v. Mirz*, 198 A.3d 295, 301 (N.J. Super. Ct. App. Div. 2018) (quoting *Strasenburgh*, 683 A.2d at 830). "A special injury exists where there is a wrong suffered by [the] plaintiff that was not suffered by all stockholders generally or where the wrong involves a contractual right of the stockholders, such as the right to vote." *Tully*, 198 A.3d at 301 (alteration in original) (quoting *Strasenburgh*, 683 A.3d at 829). The New Jersey Supreme Court has observed, however, that "a thin line often separates actions that are derivative or individual." *Strasenburgh*, 683 A.3d at 830. This distinction is significant because if a claim is "derivative," "a would-be plaintiff is required to issue demand upon the corporation to take action and to then allow ninety days to elapse, unless notified the demand was rejected by the corporation, prior to commencing a derivative suit." *Tully*, 198 A.3d at 302 (citing N.J. Stat. Ann. § 14A:3-6.3).

Plaintiffs' claims for failure to observe corporate formalities, *id.* ¶¶ 33-50, nepotism, *id.* ¶¶ 70-82, and Defendant's difficulties retaining its S-corporation status, *id.* ¶¶ 83-87, do not appear to meet the special-injury requirement.  But even assuming that those claims are derivative, a court has discretion to treat these claims as direct and "relieve the plaintiff[s] of the procedural requirements that attend a derivative suit[,]" *Tully*, 198 A.3d at 302, "if doing so would not '(i) unfairly expose the corporation or the defendants to a multiplicity of actions, (ii) materially prejudice the interests of creditors of the corporation, or (iii) interfere with a fair distribution of the recovery among all interested persons[,]'" *S&Y5, Inc. v. Sang Eun Lee*, No. 14-5911, 2016 WL 8674604, at *6 (D.N.J. Dec. 2, 2016) (quoting *Brown v. Brown*, 731 A.2d 1212, 1216 (N.J. Super. Ct. App. Div. July 7, 1999)).

Applying this standard, the Court agrees with Plaintiffs that their derivative claims may be treated as direct.  A significant number of Defendant's shareholders, as well as all concerned family members, appear to be involved in this action, indicating that there is a low chance of a multiplicity of suits.  Creditors will not be materially prejudiced because (1) granting Plaintiffs' requests for information would not impact the rights of creditors, (2) imposing corporate formalities onto Defendant would not harm creditors' rights, and (3) "the parties have not made the Court aware of any creditors that would be harmed by the failure to make written demand before bringing suit." *S&Y5, Inc.*, 2016 WL 8674604, at *6.  And because it appears that all those who wish to challenge Emerson's administration are participating in this suit, allowing the claims to go forward as direct rather than derivative would not interfere with a fair distribution of the recovery among all interested persons.  Accordingly, the Court will permit Plaintiffs' claims to proceed as direct, rather than derivative, claims.

The Court next analyzes whether there are genuine disputes of material fact as to Count Two.  Plaintiffs' shareholder oppression claim is based on (1) "discrepancies regarding shareholder interests," Am. Compl. ¶¶ 14-26; (2) "irregularities regarding shareholder distributions," *id.* ¶¶ 27-32; (3) "failure to observe corporate formalities," *id.* ¶¶ 33-50; (4) "Emerson's ancillary businesses," *id.* ¶¶ 51-57; (5) "the requests for corporate information," *id.* ¶¶ 58-69; (6) "known instances of nepotism," *id.* ¶¶ 70-82; and finally (7) issues surrounding the need for a private IRS letter ruling, *id.* ¶¶ 83-87.

Plaintiffs appear to argue that the allegations should be viewed in the aggregate to determine whether Defendant has frustrated "Plaintiffs' legitimate shareholder expectations[.]" Opp'n at 32.  Defendant focuses on the individual allegations.  Defendant asserts, as to Plaintiffs' contentions regarding shareholder distributions, that "the record's undisputed evidence establishes that Emerson at all times made distributions to its shareholders equally (that is, based only on the number of shares owned)."  Def. Br. at 17 (footnote omitted).  Defendant adds that decisions as to whether to issue distributions and their amount are insulated by the business judgment rule.  *Id.* at 19-20.  Plaintiffs counter that it is not "Emerson's board or directors" who make the decisions regarding shareholder distributions, but Dorothy Prager and Estie Hollander.  Opp'n at 31. Plaintiffs also point to Barry Hollander's deposition testimony as being irreconcilable with the fact "that shareholder distributions were exactly the same for years[.]"  *Id.*

The business judgment rule does not insulate Defendant's decisions regarding shareholder distributions from review.  Under New Jersey law, "[t]he business judgment rule generally asks (1) whether the actions were authorized by statute or by charter, and if so, (2) whether the action is fraudulent, self-dealing or unconscionable."  *Seidman v. Clifton Sav. Bank, S.L.A.*, 14 A.3d 36, 52 (N.J. 2011) (quoting *Green Party of N.J. v. Hartz Mountain Indus., Inc.*, 752 A.2d 315, 326

(N.J. 2000)).  Moreover, under New Jersey law, a "dividend declaration is within [the] discretion of [the] board of directors[,]" *Maul v. Kirkman*, 637 A.2d 928, 938 (N.J. Super. Ct. App. Div. 1994).  Plaintiffs assert that the majority shareholders have engaged in a longstanding pattern of self-interested transactions, and that "millions of dollars of Emerson funds that could otherwise have been used towards shareholder distributions were siphoned off to the Rosenson/Hollander shareholders that controlled the company[.]" Opp'n at 22.  If true, Plaintiffs' allegations bespeak bad faith and self-dealing, and the business judgment rule does not insulate such conduct.  *In re PSE&G S'holder Litig.*, 801 A.2d 295, 306 (N.J. 2002).  Thus, the inquiry turns to whether there are genuine disputes of material fact as to Defendant's bad faith.

As to shareholder distributions, the disbursement journals made part of the summary judgment record at D.E. 83-14 show that each shareholder was given a consistent amount of money each month for several years from the end of January 2013 to the end of September 2017).  *See generally* D.E. 83-3.  Similarly, Chaim Moshe Bergstein testified that his mother's Trust received the same payments for years.  *See* Chaim Dep. at 21.  Importantly, there does not appear to be anything in the record that contradicts Defendant's position "that the amounts of distributions to each shareholder were made only in proportion to the number of shares that each shareholder owns." Def. Br. at 18.  Accordingly, the Court finds that there is no genuine issue of material fact so far as Defendant's distributions are concerned.

As to Defendant's alleged ancillary businesses, the Court does not discern a genuine dispute of material fact regarding Plaintiffs' allegations, on information and belief, in the Amended Complaint that Defendant has ancillary businesses whose profits are not being shared with Emerson's shareholders.  Plaintiffs point to nothing in the record to suggest that Emerson has such ancillary businesses.  "To survive a motion for summary judgment, the plaintiff cannot rely on

unsupported allegations in the complaint[.]" *Shah v. Bank of Am.*, 346 F. App'x 831, 833 (3d Cir. 2009).  In Chaim Moshe Bergstein's deposition, he professed ignorance of whether the supposed ancillary businesses exist.  Chaim Dep. at 49.  Barry Hollander explained that the "ancillary businesses" were not, in fact, separate entities but operations run by and through Emerson. Hollander Dep. at 191.  There is nothing in the record to contradict this testimony.  The Court determines that there is no genuine dispute of material fact as to Defendant's ancillary businesses.

Plaintiff also raises allegations of nepotism as to Defendant's retention of Estie Hollander and Dorothy Prager.  Def. Br. at 24.  In addition to again invoking the business judgment rule, *id*. at 27, Defendant asserts that "Dorothy Prager and Estie Trauring Hollander have worked at Emerson at very real jobs that add substantial value to the nursing home enterprise."  *Id.* at 24. Defendant details their duties and explains that they both report to Marta Santiago.  *Id.* at 24-27. Defendant adds that their "salaries are nowhere near incommensurate with the[ir] duties[.]"  *Id.* at 27.  Plaintiffs respond that both Estie Hollander and Dorothy Prager work part-time jobs and receive salaries, benefits, or the financial equivalent thereof, including the BMW for Estie.  *Id.* at 29, 30.  Plaintiffs continue that Barry Hollander receives a $10,000 annual bonus and that he, Estie, and Prager receive unauthorized directors' fees.  *Id.* at 29, 31-32.

There are genuine issues of material fact regarding the salaries, benefits, and bonuses that Defendant provides to Barry Hollander, Estie Hollander, and Dorothy Prager.  The Court agrees with Defendant that, in the context of a closely held, family-owned corporation, hiring family members to staff the corporation does not, in and of itself, dash Plaintiffs' reasonable expectations as shareholders in such a corporation.  However, in such a corporation, "the law 'imposes a fiduciary duty upon the majority requiring it to act with utmost good faith and loyalty in transacting corporate affairs.'"  *Bostock v. High Tech Elevator Indus., Inc.*, 616 A.2d 1314, 1321 (N.J. Super.

Ct. App. Div. 1992) (quoting *Orchard v. Covelli*, 590 F. Supp. 1548, 1557 (W.D. Pa. 1984), *aff'd o.b.*, 802 F.2d 448 (3d Cir. 1986)).  The Court finds that there are genuine issues of material fact as to whether Defendant frustrated Plaintiffs' reasonable expectations when it paid Estie Hollander $79,425.00 per year, leased her a BMW, and paid her health insurance for a job that required no prior experience and requires her to work three days per week.  The same is true of Dorothy Prager's pay and Barry Hollander's bonuses.  Similarly, the Court finds that there are genuine, triable issues as to whether, in Plaintiffs' words, "Emerson funds that could otherwise have been used towards shareholder distributions were siphoned off to the Rosenson/Hollander shareholders that controlled the company[.]"  Opp'n at 22.

As to the remaining factual contentions, there are also genuine disputes of material fact as to Emerson's adherence with the corporate formalities called for in the corporation's bylaws. There is conflicting evidence in the record—Barry Hollander's testimony that there are board meetings, Hollander Dep. at 46, 51; the lack records of such meetings (other than costs incurred for a trip to Florida, *id.* at 118); and Prager's testimony that she is "sure [the bylaws] are not being complied with[,]" Prager Dep. at 42.  Additionally, there are no board resolutions or minutes of stockholder meetings approving bonuses or directors' fees, the latter of which are apparently not authorized the corporation's bylaws.  Plaintiffs, however, do not respond to Defendant's assertion that there are no genuine disputes of material fact regarding Plaintiffs' claims that their ownership has been diluted, and summary judgment is granted on this issue.  The Court finally observes that the parties do not address Emerson's S corporation status in their submissions in support of or against the instant summary judgment motion.

## IV.    CONCLUSION

In sum, the Court **DENIES** Defendant's motion for summary judgment.   However, as noted certain aspects of Plaintiffs' case will be limited going forward.   An appropriate Order accompanies this Opinion.

Dated:  November 22, 2021

_____
JOHN MICHAEL VAZQUEZ
UNITED STATES DISTRICT JUDGE